**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X
UNITED STATES OF AMERICA,


     -against-                       07-CR-580-02 (CM)


NICHOLAS SANTANA,
               *DEFENDANT.*
------------------------------X

### NICHOLAS SANTANA'S MEMORANDUM OF LAW IN SUPPORT OF A NON-GUIDELINES SENTENCE UNDER 28 U.S.C. 3553 (a)

### PRELIMINARY STATEMENT

Nicholas Santana stands before the Court to be sentenced for violations of 21 U.S.C. § 812, § 841 (A) (1), and § 841(b) (1) (a) (Conspiracy to Distribute and Possess with Intent to Distribute more than 1000 Kilograms of Marijuana). Mr. Santana accepts the facts admitted and the Guideline calculations contained in the Department of Probations February 2008 Pre-Sentence Report. Nevertheless, he respectfully contends that a Guideline sentence between 168 to 210 months of imprisonment is "greater than necessary" to satisfy the factors contained in 18 U.S.C. § 3553 (a). Consequently, he asks that the Court impose a non-Guidelines sentence in accordance with Booker, Crosby, and 18 U.S.C. 3553 (a). Certainly, a non-Guideline sentence of 120 months of incarceration, that is

the mandatory minimum sentence of imprisonment under 21 U.S.C. 841 (b) (1) (a), would properly reflect the § 3553 (a) considerations in this case.

Mr. Santana's extraordinary family circumstances, chronic drug and alcohol dependence, solid employment record, and lack of criminal history all mitigate in favor of a non-Guidelines sentence. Mr. Santana was 33 years-old at the time of his arrest. Before his arrest, he had been neither arrested, nor convicted of any crime. His offense conduct did not involve serious bodily injury, death, or the discharge or brandishing of a firearm. The offenses occurred during a criminal episode of limited duration, which involved a conspiracy to distribute marijuana and represent a marked deviation by him from an otherwise law-abiding life.

When fashioning the appropriate sentence in this case the Court should be guided by all of the factors set forth in 18 U.S.C. § 3553 (a). After all, the Second Circuit in United States v. Jones 460 F.3d 191, 195 (2d Cir.2006), found that after the entire Guidelines scheme was rendered advisory by the Supreme Court's decision in Booker, the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves. The Court is

2

still obligated to "consider" the Guidelines, under 18 U.S.C. § 3553(a)(4), along with the other relevant factors listed in § 3553 (a) including consideration of the Commission's relevant policy statements as well as the calculated Guidelines range. But "consideration" does not mean mandatory adherence.

Further, in Rita, the Supreme Court held that a court of appeals may apply a presumption of reasonableness to a district court sentence imposed within a properly calculated Guideline range. Critically, however, the Court said that such a presumption does not apply in the district court. There, a defendant may argue for a non-Guidelines sentence (1) on the basis of traditional departure grounds, (2) because the Guidelines sentence itself fails properly to reflect § 3553 (a) considerations, or (3) because a case warrants a different sentence regardless. In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. Rita v. United States, 127 S.Ct. 2465 (2007); Gall v. United States, 128 S.Ct. 586, 597, 602 (2007); Kimbrough v. United States, 128 S.Ct. 576 (2007). Moreover in Kimbrough, Justice Scalia observed that Sixth Amendment prohibits appellate courts from applying rules or standards of review that effectively

place a "thumb on the scales" in favor of Guidelines sentences. <u>Kimbrough</u>, 128 S.Ct. at 577.

Last month in <u>Jones</u>, the Second Circuit emphasized the importance of the "individualized assessment" of the district court, which "has access to, and greater familiarity with, the individual case and the individual defendant before it" and is charged with the "particular trust" of ensuring that "every convicted person be considered as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." <u>United States v. Jones</u>, 05-5879-cr, 2008 WL 2500252 (2d Cir. June 24, 2008). As such, the Court is not prohibited from including in that consideration its own sense of what is a just sentence under all the circumstances. For the reasons set forth below, the Court should, as it is empowered to do, impose a non-Guidelines sentence of 120 months of imprisonment and thereby decline to imprison Mr. Santana for any amount of time that fails to accomplish "individualized justice."

As the Court will learn in reading the letters received on Nicholas Santana's behalf, he is a gentle, loving and loyal friend, in ways large and small. His life story is a tragic one in which he recently committed a

serious crime, but his character and self-respect have enabled him to face his wrongdoing. And one cannot help but note that despite this conviction, Nicholas Santana remains a decent person, far from a remorseless criminal deserving a period of incarceration in excess of ten years.

The further punishment that the "advisory" Guidelines seek is neither fair nor balanced given Nicholas Santana's unique individual circumstances when weighed against the facts of this case. Nor is it necessary, given that the punishment he and those who love him have suffered and will continue to suffer will certainly deter future conduct by similarly situated individuals. But considering all of the facts, the offender as well as the offense, the man as well as his conduct, there is no reasonable social goal to be served by a 168 to 210 month period of incarceration, only the further destruction of a man who has accepted responsibility for his crime and who will continue to pay his debt to society for years to come.

Nicholas Santana respectfully submits that the only fair and balanced disposition of this matter necessarily entails a non-Guidelines sentence.

## PERSONAL BACKGROUND

**A.    A Rough Start**

Nicholas Santana was born into an environment of distress 33 years ago in New York City. Unquestionably, his childhood was defined by drug addiction, alcoholism, disease, and death. He is one of two children born into the ill-fated union of his father, George Santana and his mother, Debra Sica. Because both of his parents were hopelessly addicted to drugs and alcohol, Mr. Santana never experienced a "childhood" as most people would define it. The impact of his parents' drug and alcohol addictions upon him was stunning. For instance, by the time he was six years old, his mother died from liver failure that was directly attributed to her alcoholism.[1]  Before her death, her alcoholism fueled an atmosphere of chaos and neglect because her disease came before her children. For example, as a child Mr. Santana's older brother, Christopher, suffered severe physical and mental injuries when he fell from the roof of an armory that he was playing on. These injuries have afflicted his brother throughout his entire life.  Mr. Santana cannot recall a time when his older brother's physical and mental capabilities were normal.

---

[1] **SEE;** Presentence Investigation Report, ¶¶ 66-68 dated 1/22/08 (Docket No. 07-CR-580-02)(HEREINAFTER "PSR")

During these tragic events, Mr. Santana's father rendered no assistance whatsoever to his children. Throughout his childhood, adolescence and early adulthood, Mr. Santana had little contact with his father because his father was a drug addict whose criminal activity resulted in his being incarcerated in various prisons during most of Mr. Santana's life.  Indeed, his father was dead from AIDS shortly after Mr. Santana turned twenty-one.

After his mother's death, Nicholas Santana was sent to live with his maternal grandfather, Anthony Sica. He lived with his grandfather until his death two years later in 1983.  At age eight, Mr. Santana was then sent to live with his paternal grandmother, Emma Santana in the Bronx, New York.[2]  Thus, by the time Mr. Santana was eight years old he had already experienced the death of his mother and his maternal grandfather, both of them having been his primary caretakers.

Mr. Santana lived with his grandmother until he was 20 years-old. His grandmother was a poor immigrant who spoke virtually no English and was unable to provided Nicholas Santana any discipline or direction.[3]  Mr. Santana was left

---

[2] PSR ¶ 65
[3] PSR ¶ 66

to raise himself without the guidance that most children are given. But the worst was yet to come.

**B.    Slipping Into Darkness**

Not understanding his parents' drug and alcohol dependence, his mother and grandfather's deaths, his father's desertion, the lack of love, direction and discipline, left him unable to cope with his personal realty. This problem was exacerbated by the even harsher social realty of the rough and tumble street life in the Bronx. Eventually, during his early teenage years as the unyielding chaos swirled around him, he began to lose his grip and was caught up in the morass of events which led to his own drug and alcohol dependence and personal destruction.

For the past 20 years, Nicholas Santana has been abusing marijuana, alcohol, cocaine and prescription medications on a daily basis.[4]  Perhaps the unexpected blessing that this case has brought to Mr. Santana is that from his arrest until today, he has lived without alcohol or drugs.  Notably, he has come to believe that although his mind is just beginning to clear up, it will take honesty and commitment from him and a tremendous amount of help from others by way of counseling and treatment to

---

[4] PSR ¶ 76

conquer his addictions. In short, he is now beginning to connect the trouble in his life with his drug and alcohol dependence. Although he has never been treated for his substance abuse, Mr. Santana intends to take advantage of any treatment which would aid in his rehabilitation.

**C.    Troubles in School**

While in the seventh grade, Nicholas Santana began experiencing difficulties in school. After becoming disruptive and cutting the classes he was attending, he was sent to a school counselor. Later, Mr. Santana attended sessions at the Riverdale Mental Health Center for approximately one year. Shortly thereafter, Nicholas Santana dropped out of John F. Kennedy High School after completing the ninth grade. However, in January 1995, Mr. Santana did earn a High School Equivalency Diploma.[5]

Although never diagnosed, Mr. Santana believes that he was and continues to suffer from Attention Deficit Hyperactivity Disorder (ADHD). As noted in the "PSR," the symptoms of ADHD begin in childhood and can continue into adulthood if not treated properly.[6]  One of the three major symptoms of ADHD is "Impulsivity" defined as an inability to make sound judgments, solve problems well, or acting

---

[5] PSR ¶ 80
[6] PSR ¶ 75

before the person thinks.  It is not surprising that the Attention Deficit Hyperactivity Disorder (ADHD) from which Mr. Santana believes he suffers was never diagnosed. After all, even if it had been, there was nobody at home after school.

**D.    A Remarkably Solid Employment History**

Despite the ordeals of his childhood, troubles in school, and his own drug and alcohol dependence, Mr. Santana has achieved a remarkably solid employment history. He has been continuously employed for the past 12 years.[7] Mr. Santana's employment history shows that his life has also defined by a commitment to hard work and responsibility. Scott Corr, a co-worker and friend of Mr. Santana's, found that "he was responsible and hardworking, and always there for the team.[8]

**E.    I Miss Having Him Here Every Day**

Nicholas Santana met Tina Stiglianese, when he was in the seventh grade.[9] The couple had been close friends for 18 years. Their friendship blossomed into romance and the couple lived together in a committed relationship for seven years.

---

[7] PSR ¶¶ 81-86
[8] EXHIBIT "A"
[9] EXHIBIT "A"; PSR ¶¶ 69-72

Ms. Stiglianese is currently employed as an accounting assistant for a construction company. However, she also suffers from migraine headaches, depression, anxiety and Obsessive Compulsive Disorder (OCD). She relies on medication and therapy to treat her conditions. But Ms. Stiglianese states that medication and therapy are not everything when the going gets rough. Her letter and words to the Department of Probation indicate the depth of her distress over her separation from Mr. Santana and affirms the care and concern he showed to his committed partner for the past seven years.[10]

**OFFENSE CONDUCT**

**F.    The Instant Case**

Nicholas Santana was arrested by federal agents on May 10, 2007, for a violations of 21 U.S.C. § 812, § 841(b) (1) (B), and § 841(b) (1) (B). He has been incarcerated since that time. Thereafter, he was indicted by a Grand Jury sitting in the Southern District of New York. The indictment, in two counts, charged violations of 21 U.S.C. § 812, § 841(a) (1), and § 841(b) (1) (A) and 18 U.S.C. § 924 (c). Count One charged that between May 2006, and May 10, 2007, Mr. Santana conspired with others to distribute and to possess with intent to distribute more

---

[10] Id.

than 1000 kilograms of marijuana, in violation of 21 U.S.C. § 812, § 841(a)(1) and § 841(b)(1)(A). Count Two charged that in or about May 2007, Mr. Santana used and carried a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924 (c).

His offense conduct did not involve serious bodily injury, death, or the discharge or brandishing of a firearm. The offenses occurred during a criminal episode of limited duration where there were no identifiable victims who suffered emotional or financial injury.

**G.    2007 Plea Agreement**

Under the 2007 plea agreement, Mr. Santana plead guilty before the Magistrate Judge Lisa Margaret Smith to Count One of the afore-mentioned indictment, with an understanding that nothing in the plea agreement precluded Mr. Santana from moving for a non-Guidelines sentence under 18 U.S.C. § 3553 (a).

According the 2007 Plea Agreement, the Base Offense Level is 34 and was based on a Criminal History Category of Level I.[11]  The Total Adjusted Offense Level of 35 included the following adjustments:

- + 2 defendant possessed a firearm (2D1.1(b)(1))

---

[11] Exhibit "B" The Guidelines effective November 1, 2007, apply here.

- + 2 defendant was an organizer (3B1.1(c))
- - 2 Acceptance of Responsibility (3E1.1(a))
- - 1 Additional one point reduction (3E.1(b))

The advisory Guideline estimates contained in the Plea Agreement contained a range of imprisonment of 168 to 210 months. In addition, § 841(b) (1) (A) requires a statutory mandatory minimum term of imprisonment of 120 months.

**H.    2008 Pre-Sentence Report**

The advisory Guideline estimates contained in the Department of Probations 2008 Pre-Sentence Report are the same as the Guideline estimates contained in the Plea Agreement.[12]  According to the 2008 "PSR," the Base Offense Level is 34 and was based on a Criminal History Category of Level I.  The Total Adjusted Offense Level of 35 included the following adjustments:

- + 2 defendant possessed a firearm (2D1.1(b)(1))
- + 2 defendant was an organizer (3B1.1(c))
- - 3 Adjustment for Acceptance of Responsibility (3E1.1 (a) and 3E1.1 (b))

Based on a total offense level of 35 and a criminal history category of I, the Guideline imprisonment range is 168 to 210 months.

---

[12] See; 2008 Pre Sentence Report. Docket No. 07-CR-580-02 (CLB)

I.    **Objections to the 2008 Pre Sentence Report (PSR)**

Mr. Santana does not object to the Guideline calculations contained in the "PSR".

<u>**ARGUMENT**</u>

**A  NON-GUIDELINE SENTENCE OF 120 MONTHS OF IMPRISONMENT IS "SUFFICENT BUT NOT GREATER THAN NECESSARY" TO SATISFY THE FACTORS CONTAINED IN <u>18 U.S.C. § 3553</u> (A)**

**A. Legal Standard**

The Supreme Court's decision in <u>Booker</u> radically changed the sentencing regime that has existed since the Guidelines became effective on November 1, 1987. <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).  In the "remedial opinion," Justice Breyer found that the appropriate remedy for the Constitutional violation needed to implement the substantive opinion, was "[s]everance and excision…" with respect to two provisions of the ("SRA").  <u>Id</u>. at 764.  The two invalidated provisions, <u>18 U.S.C. § 3553</u> (b) (1) and <u>18 U.S.C. § 3742</u> (e), had mandated use of the Guidelines in sentencing and dealt with the standard of review of sentences on appeal, respectively.  <u>Id</u>.  Once the Court in <u>Booker</u> invalidated those provisions, the Sentencing Guidelines were no longer binding on district court judges.  "So modified, the…

Sentencing Reform Act of 1984… makes the Guidelines effectively advisory, [and]… requires a sentencing court to consider Guidelines ranges, … but it permits the court to tailor the sentence in light of other statutory concerns as well…"  <u>Id</u>. at 749.  Hence, the Federal Sentencing Guidelines are no longer "mandatory," but rather are now "effectively advisory."  <u>Id</u>.  According to <u>Booker</u>, the controlling statutory provision in sentencing is not the "advisory Guidelines" but instead, <u>18 U.S.C. § 3553</u> (a).

**B. Application**

**1.   History and Characteristics of Nicholas Santana**

The history and character of the defendant, Nicholas Santana, call for leniency and mercy; therefore, the Court should impose a non-Guidelines sentence. The "individualized consideration" that he is entitled to receive at sentencing, <u>United States v. Crosby</u>, 397 F.3d 103,114 (2d Cir. 2005) (discussing the importance of providing defendants with sentences achieving individualized justice.), show that his history and character should dominate the Court's reasoning when imposing his sentence.

Mr. Santana's extraordinary family circumstances, chronic drug and alcohol dependence, solid employment record, and lack of criminal history all mitigate in favor

of a non-Guidelines sentence. After all, Mr. Santana's life was law-abiding and characterized by hard work for many years prior to committing the charged offenses.

The letters provided to the Court by those who still love, support and need Mr. Santana, need not be reiterated here to demonstrate why he deserves a second chance. Suffice it to say that his friends and those dear to him have pleaded for mercy on his behalf based upon his love and dedication to them, and the need for them to have him in their lives. Certainly, he has remained a kind and decent person, far from a remorseless repeat offender deserving of long term incarceration. The Court should also consider that a Guideline sentence of imprisonment from 168 to 210 months for a first time offender is "greater than necessary" and will devastate the innocent people that have loved and supported him. Undeniably, a non-Guidelines sentence would provide an assurance to his family and friends that he would not remain inside of a prison in excess of ten years. Conversely, an unreasonable term of incarceration will afford little hope and rough justice to a man who despite his wrongdoing has demonstrated an ability to help others. Further, Mr. Santana has accepted responsibility for his actions and by all accounts has

expressed heartfelt remorse and an honest commitment to conquer his addictions.

**2.    The Nature and Circumstances of the Offense**

The nature and circumstance of this offense should include serious consideration of the unique facts underlying this prosecution. The crime to which Mr. Santana pled guilty in December 2007 was a non-violent offense. There were no identifiable victims who suffered physical injury or death. There are no allegations that he discharged a firearm, or otherwise brandished a firearm. He has no criminal history. Before his arrest, he had been neither arrested, nor convicted of any crime. The offenses occurred during a criminal episode of limited duration, which involved a conspiracy to distribute marijuana and represent a marked deviation by him from an otherwise law-abiding life. In sum, a genuine consideration of the true nature and circumstances of the offense cannot but leave one with the sense that a 168 to 210 month term of incarceration would be "greater than necessary" to satisfy the § 3553 (a) factors.

**3.    The Need For The Sentence Imposed**

Section 3553 (a) (2) contains four sub-parts that require consideration of the severity of the offense, respect for the law, punishment, deterrence, the need to

protect the public, and the need to rehabilitate the defendant. The complete and utter destruction of Mr. Santana's life, and the devastation this matter has wrought upon those who love him, has been and will continue to be sufficient to reflect the severity of this offense, provide just punishment and deterrence, and promote respect for the law. Mr. Santana has been imprisoned since his arrest in this case. Even under non-Guidelines sentence, Mr. Santana must serve a statutory mandatory minimum term of imprisonment of 120 months and post release supervision.

Further, this prosecution has damaged his reputation; he is now a convicted felon and forever will be stained by this prosecution and conviction. His life, as he knew it, is over. Moreover, many individuals who know Mr. Santana know that the criminal activity he participated in has been destroyed and will, to the extent that they can possibly be guided by this prosecution, be deterred accordingly. This conviction has also punished Mr. Santana by causing him to watch his family members, friends and Tina Stiglianese suffer. Indeed, unjust punishment, in contravention of 18 U.S.C. § 3553(a)(2)(A), is, respectfully, precisely what this Court would impose if, given the specific facts of this offense, it fails to account for the punishment that Mr. Santana and those who love him have suffered.

Finally, the sentence should provide Mr. Santana with the necessary care needed to combat his drug and alcohol addiction as well as a recommendation for drug and alcohol treatment.

**4.    The Kinds of Sentences Available**

Mr. Santana urges the Court to impose a sentence of 120 months, which is the mandatory minimum sentence based upon a conviction of 21 U.S.C. § 841(b) (1) (a).

**5.    Avoiding Sentencing Disparity**

The Court should impose a sentence below the guideline range to avoid a disparity of sentences between Mr. Santana and other defendants involved in this conspiracy. Section 3553 (a)(6) directs that the sentencing court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  The courts have generally held that considering the disparity between similarly situated co-defendants is appropriate. See United States v. Krutsinger, 449 F.3d 827, 830 (8th Cir. 2006). If the court were to impose a sentence within the Guidelines range it would essentially be sentencing Mr. Santana to a significantly greater period of incarceration that the other similarly situated defendants have received.

5.    **Consulting the Advisory Guideline Factors**

In <u>Crosby</u>, 397 F.3d 103, the Second Circuit began to
apply <u>Booker</u>.  The court in <u>Crosby</u> concluded that although
the mandatory aspect of the Guidelines was excised, the
Guidelines still warranted consideration.  So, under
<u>Crosby</u>, judges remain under a duty to "consider" the
Guidelines along with the other factors listed in <u>18 U.S.C.</u>
<u>3553</u> (a), but are under no duty to apply the Guidelines.
<u>Id</u>. at 111.  After "considering" the "advisory" Guidelines
and all of the <u>§ 3553</u> (a) factors detailed above, this
Court should decide to impose a non-Guidelines sentence.

The <u>Crosby</u> decision declined to define "what degree of
consideration is required, or, to put it another way, what
weight the sentencing judge should normally give to the
applicable Guidelines range," preferring "to permit the
concept of consideration… to evolve as district judges
faithfully perform their statutory duties."  <u>Crosby</u>. 397
F.3d  at 113.  This Court should apply the same, if not
lesser weight, to the Guidelines in its overall <u>§ 3553</u>(a)
analysis.  As explained by the Court of Appeals,
"[c]onsideration of the § 3553(a) factors is not a cut-and-
dried process of fact-finding and calculation; instead, a
district judge must contemplate the interplay among the
many facts in the record and the statutory guideposts."

United States v. Fernandez, 443 F.3d 19, 29 (2d Cir.2006).

In Rita v. United States, 127 S.Ct. 2456, 2465 (June 21,

2007), the Supreme Court found that a presumption of

reasonableness does not apply to a properly calculated

Guideline range in the district court. Further, "… in Gall,

the Supreme Court ruled that no presumption of

unreasonableness may be applied to sentences outside

applicable Guidelines ranges." United States. v.

Verkhoglyad, 2008 WL 383291 (2d Cir, 2008) (quoting Gall,

128 S.Ct. at 597). This Court should make an

"individualized assessment" of the sentence under § 3553(a)

"based on the facts presented."  United States v. Jones,

05-5879-cr, 2008 WL 2500252 (2d Cir. June 24, 2008). Here,

the Court is not prohibited from including in that

consideration its own sense of what is a just sentence

under all the circumstances.  As such, the Court should, as

it is empowered to do, impose a non-Guidelines sentence of

120 months of imprisonment and thereby decline to imprison

Mr. Santana for any amount of time that fails to accomplish

"individualized justice."

Judge Weinstein summed up this issue best: "The best

policy considerations can be unnecessarily cruel when

applied rigidly and without exception to individual human

beings ... Some [offenders] would be destroyed by a term in

prison. There are defendants for whom prison incarceration makes no sense." Weinstein, *Prison Need Not Be Mandatory,* There are Options Under the New U.S. Sentencing Guidelines. 28 No. 1 Judge J. 16 (1989). Nicholas Santana is one such human being.

### Conclusion

Because the majority of Nicholas Santana's life awaits him in the future, he is particularly deserving of a meaningful chance at rehabilitation. Based upon all of the foregoing, Counsel respectfully requests that the Court impose a non-Guideline sentence.



DATED: JULY 14, 2008          RESPECTFULLY SUBMITTED,
BRONX, NEW YORK

                              _____   x_____
                              THOMAS J. SULLIVAN, ESQ.
                              930 GRAND CONCOURSE
                              BRONX, NEW YORK 10451
                              COUNSEL FOR NICHOLAS SANTANA